IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA14-1351

Filed: 1 December 2015

North Carolina Industrial Commission, No. 375716

CONNIE CHANDLER, by her Guardian *Ad Litem* CELESTE M. HARRIS, Employee, Plaintiff,

v.

ATLANTIC SCRAP AND PROCESSING, Employer, and LIBERTY MUTUAL INSURANCE CO., Carrier, Defendants.

Appeal by defendants from opinion and award entered on 11 August 2014 by the North Carolina Industrial Commission. Heard in the Court of Appeals on 6 May 2015.

*Walden & Walden, by Daniel S. Walden, for plaintiff-appellee.*

*Hedrick Gardner Kincheloe & Garofalo, LLP, by Hatcher Kincheloe and M. Duane Jones, for defendant-appellants.*

STROUD, Judge.

Following this Court's prior opinion affirming the Industrial Commission's award of compensation for attendant care services provided to Connie Chandler ("plaintiff") by her husband, Lester Chandler, and our Supreme Court's affirmance of that opinion, Atlantic Scrap and Processing ("Atlantic Scrap") and Liberty Mutual Insurance Co. ("Liberty Mutual," collectively "defendants") appeal from the opinion and award of the Industrial Commission entered on remand, which awarded plaintiff

interest on the unpaid portions of attendant care compensation and attorneys' fees for the prior appeal. Defendants argue that on remand the Commission failed to follow our Supreme Court's mandate because it did not make additional findings of fact on the reasonableness of plaintiff's delay in requesting compensation for Mr. Chandler's attendant care services. Because the Industrial Commission complied fully with the mandates of the Supreme Court and this Court, we affirm and grant plaintiff's motion for attorneys' fees.

## I.     Background

We have previously set forth the factual and procedural background of this case in this Court's previous opinion:

> Plaintiff began working for Atlantic Scrap, a metal recycling facility, in 1994. Plaintiff was hired to clean Atlantic Scrap's three buildings. On 11 August 2003, plaintiff began her work duties with Atlantic Scrap at 7:00 a.m. As plaintiff was walking down a flight of concrete steps, she accidentally fell backwards, striking the posterior portion of her head and neck on the steps. When EMS personnel arrived at the scene, plaintiff was confused and agitated and had a bruise with swelling on the back of her head. Plaintiff's primary complaints at that time were headache and neck pain. Upon arriving at the hospital, plaintiff related to the treating physician that she went up a flight of stairs to begin her work when she slipped and fell, hitting her head on the stairs. Plaintiff also mistakenly stated that the month was January and that it was cold outside, despite that the month was August, and plaintiff was unaware of the year. Nonetheless, all radiological tests were negative. Plaintiff was determined to have sustained a concussion or closed head injury, a neck injury, and a right partial rotator cuff tear, all due to her

fall.

After her fall, during the period from 13 August 2003 through November of that year, plaintiff treated with her primary care physician, Dr. Norman Templon ("Dr. Templon"). Plaintiff's primary symptoms from her fall continued to be global headaches, right shoulder pain, neck pain, dizziness, and insomnia. Plaintiff also developed depression due to her injuries.

In October 2003, plaintiff's husband, Lester Chandler ("Mr. Chandler"), advised Dr. Templon that plaintiff had been having significant memory problems, sensitivity to light, and some nausea and vomiting almost every day since her fall. On 31 October 2003, a brain MRI revealed that plaintiff had evidence of small vessel ischemic changes in her white matter. By November 2003, plaintiff had constant occipital headaches and frequent crying spells.

In November 2003, Dr. Templon diagnosed plaintiff as suffering from cognitive impairments secondary to post-concussive syndrome. Dr. Templon referred plaintiff to neuropsychologist Cecile Naylor ("Dr. Naylor") for evaluation of plaintiff's cognitive functioning and memory. On 3 December 2003, testing by Dr. Naylor revealed that plaintiff had selective deficit in verbal memory, impaired mental flexibility, depression, and a low energy level.

On 23 December 2003, Dr. Templon recommended that plaintiff also see a neurologist. Defendants directed plaintiff to see neurologist Carlo P. Yuson ("Dr. Yuson"). Plaintiff presented to Dr. Yuson on 14 January 2004, complaining primarily of frequent headaches and memory problems since her fall. Dr. Yuson diagnosed plaintiff as suffering from post-concussive syndrome from her fall, along with depression secondary to her fall. Plaintiff continued to see Dr. Yuson throughout March, April, and May 2004, presenting the following continuing symptoms: severe headaches, memory problems, dizziness, crying spells, insomnia, cognitive problems, and depression. Dr. Yuson recommended that plaintiff be re-evaluated concerning her cognitive functioning and memory problems.

On 3 May 2004, Liberty Mutual assigned Nurse Bonnie Wilson ("Nurse Wilson") to provide medical case management services for plaintiff's claim. Nurse Wilson arranged for plaintiff's cognitive functioning and memory to be re-evaluated by Dr. Naylor. Plaintiff presented to Dr. Naylor for testing on 28 June 2004, tearful and clinging to Mr. Chandler. Testing revealed the following: (1) plaintiff's intellectual functioning had fallen from the borderline to impaired range; (2) plaintiff's memory functioning revealed a sharp decline into the impaired range in all areas; (3) plaintiff had a significant compromise in her conversational speech, *i.e.*, plaintiff only spoke when spoken to, her responses were often short and often fragmented and confused, and plaintiff had difficulty responding to questions. Plaintiff also exhibited the following symptoms: (1) inability to answer questions; (2) fearful and reliant on Mr. Chandler; (3) hears people in the home without any basis; (4) is afraid to go anywhere alone, even in her own home; (5) is easily upset; (6) has significant confusion, as her speech makes no sense; (7) has poor concentration and memory; (8) her moods change quickly; (9) is incapable of performing even simple tasks of daily living; (10) is unable to cook anything; (11) takes naps during the day due to frequent insomnia at night; (12) has decreased appetite and poor energy; (13) cries easily; and (14) feels worthless. All of these test results and symptoms indicated that as of 28 June 2004, plaintiff suffered from severe and global cognitive deficits in higher cortical functioning, all as a result of her 11 August 2003 fall at work.

Beginning on or before 28 June 2004, plaintiff has been incapable of being alone and has been unable to perform most activities of daily living without assistance from Mr. Chandler. Plaintiff has required constant supervision and attendant care services on a 24-hours-a-day/7-days-a-week basis, including at night, due to her severe cognitive impairments, insomnia, paranoia, and fear of being alone. Mr. Chandler has provided the required constant attendant care services to plaintiff for the period beginning at least 28 June 2004 and

continuously thereafter, without any compensation for his services.

On 20 July 2004, Dr. Naylor reported plaintiff's severe cognitive and memory impairments to Nurse Wilson, discussing Dr. Naylor's written evaluation report and conclusions with Nurse Wilson. Dr. Naylor informed Nurse Wilson that plaintiff's cognitive and mental condition had greatly deteriorated since prior testing in early December 2003 and that plaintiff was no longer capable of caring for herself and needed constant supervision, which out of necessity was being provided by Mr. Chandler. On 23 August 2004, plaintiff was determined to have reached maximum medical improvement in relation to her traumatic brain injury resulting from her fall. On 21 September 2004, defendants filed a Form 60 Employer's Admission of Employee's Right to Compensation for a "concussion to the back of the head," reporting payment of temporary total disability compensation at $239.37 per week from the date of 11 August 2003.

On 27 October 2004, plaintiff presented to Dr. Yuson, accompanied by Nurse Wilson. Dr. Yuson notified Nurse Wilson that, in his opinion, plaintiff would never get any better mentally than she was as of 23 August 2004, when plaintiff was determined to have reached maximum medical improvement. Dr. Yuson again discussed Dr. Naylor's 20 July 2004 report with Nurse Wilson, including that plaintiff required constant attendant care services due to her cognitive and emotional impairments resulting from her fall. However, defendants elected not to secure attendant care services or pay Mr. Chandler for the attendant care services he provided to plaintiff.

In the period from January 2005 through October 2007, plaintiff's cognitive and emotional condition continued to slowly become worse, regressing to that of a four-year-old child due to her brain injury from her fall at work. In April 2008, Dr. Yuson opined in a written note that plaintiff was permanently totally disabled due to her brain injury from her fall at work.

*Chandler v. Atl. Scrap & Processing*, 217 N.C. App. 417, 418-21, 720 S.E.2d 745, 747-49 (2011) ("*Chandler I*"), *aff'd per curiam and remanded*, 367 N.C. 160-61, 749 S.E.2d 278 (2013).

On 10 December 2008, the Clerk of Court for Stokes County determined that plaintiff was incompetent and appointed Mr. Chandler as guardian of the person of plaintiff. On 11 December 2008, the Commission entered an order appointing Celeste Harris as plaintiff's guardian *ad litem* for this action.

> In March 2009, Dr. Yuson again noted that plaintiff had continued to get worse in her cognitive and emotional conditions. On 3 April 2009, occupational therapist and life care planner Vickie Pennington ("Ms. Pennington") prepared a life care plan concerning plaintiff. Ms. Pennington's recommendations concerning plaintiff's care included, *inter alia*, that plaintiff needs constant attendant care for her lifetime, that plaintiff needs attendant care services in her home rather than in an institution or outside facility, and that it is not healthy or reasonable or best for plaintiff that Mr. Chandler continue to care for plaintiff exclusively. Dr. Yuson reviewed Ms. Pennington's life care plan, which he opined was medically necessary and reasonable for plaintiff.
>
> On 27 August 2008, plaintiff filed a Form 33 Request that Claim be Assigned for Hearing, seeking "payment of attendant care services by her husband Lester Chandler beginning 20 July 2004 forward," and an award of permanent total disability. On 12 April 2009, defendants filed a Form 33R response denying plaintiff's claim for the following reasons: (1) plaintiff's "current medical condition" was not causally related to her accident; (2) plaintiff was not permanently and totally disabled; and (3) plaintiff was not entitled to payment for attendant care services "rendered prior to written approval of the Commission, which has yet to be obtained."

*Id.* at 421-22, 720 S.E.2d at 749 (brackets omitted).

Plaintiff prevailed at her initial hearing before the Deputy Commissioner on 13 April 2009. *Id.* at 422, 720 S.E.2d at 749. The Deputy Commissioner found that plaintiff was permanently totally disabled and that defendants must provide all medical compensation, including payment at the rate of $15.00 per hour for Mr. Chandler's around-the-clock attendant care services starting on 28 June 2004, as well as payment for additional services as noted in plaintiff's life care plan. *Id.*, 720 S.E.2d at 749.

> On 25 August 2009, defendants appealed Deputy Commissioner Rideout's opinion and award to the Full Commission. On 20 November 2009, plaintiff moved the Commission to award interest on the past due attendant care pursuant to N.C. Gen. Stat. § 97-86.2 (2009), to be paid by defendants directly to Mr. Chandler. On 25 February 2010, the Commission filed its opinion and award, generally affirming Deputy Commissioner Rideout's opinion and award, but changing the hourly rate for attendant care services payable to Mr. Chandler to $11.00 per hour for 15 hours per day, rather than $15.00 per hour for 24 hours per day. The Commission declined to award interest to Mr. Chandler "in its discretion."
> On 26 February 2010, plaintiff filed a motion to amend the Commission's 25 February 2010 opinion and award, this time seeking an order of mandatory payment of interest to plaintiff, instead of to Mr. Chandler, pursuant to N.C. Gen. Stat. § 97-86.2. On 7 February 2011, the Commission filed an order declining to award plaintiff the interest. Plaintiff and defendants filed timely notices of appeal to this Court.

*Id.* at 422-23, 720 S.E.2d at 749-50.

In the first appeal, defendants' main argument was that the Commission erred in compensating Mr. Chandler for attendant care services because plaintiff failed to request prior approval from the Commission for these services. *Id.* at 425, 720 S.E.2d at 751. On 20 December 2011, this Court disagreed with defendant and held that Mr. Chandler was entitled to compensation for attendant care services, because "defendants had notice of plaintiff's required attendant care services, which out of necessity, were being provided by Mr. Chandler." *Id.* at 427, 720 S.E.2d at 752. On 8 November 2013, on discretionary review, our Supreme Court affirmed *per curiam* this Court's decision but remanded the case to the Commission "for further proceedings not inconsistent with [*Mehaffey v. Burger King*, 367 N.C. 120, 749 S.E.2d 252 (2013)]." *Chandler v. Atl. Scrap & Processing*, 367 N.C. 160-61, 749 S.E.2d 278 (2013).

On 11 August 2014, on remand, the Commission noted the "lengthy procedural history" of this case and concluded that

> the only matters before the Commission pursuant to the remand by the appellate courts and the 9 January 2012 and 30 December 2013 mandates of the Court of Appeals are for the Commission to (1) enter an award of interest on the unpaid balance of the attendant care compensation that defendants owe to plaintiff pursuant to N.C. Gen. Stat. § 97-86.2 and (2) determine the amount of attorneys' fees to be awarded to plaintiff's counsel pursuant to N.C. Gen. Stat. § 97-88 for defending against defendants' appeal to the Court of Appeals.

The Commission accordingly awarded interest on the unpaid balance of attendant care compensation and attorneys' fees. On or about 18 August 2014, defendants moved to reconsider. On 29 August 2014, the Commission denied the motion. On 24 September 2014, defendants gave timely notice of appeal.

## II. The North Carolina Supreme Court's Mandate

Defendants argue that on remand the Commission failed to follow our Supreme Court's mandate by failing to make additional findings of fact on the issue of the reasonableness of plaintiff's delay in requesting compensation for Mr. Chandler's attendant care services. Defendants point out that in its mandate, our Supreme Court referenced its holding in *Mehaffey*:

> For the reasons stated in [*Mehaffey v. Burger King*, 367 N.C. 120, 749 S.E.2d 252 (2013)], the decision of the Court of Appeals is affirmed as to the matter on appeal to this Court, and this case is remanded to that court for further remand to the Industrial Commission for further proceedings not inconsistent with *Mehaffey*.

*Id.*, 749 S.E.2d 278. Defendants essentially argue that because the *Mehaffey* case was remanded for additional findings of fact as to the reasonableness of that plaintiff's delay in requesting compensation, the Supreme Court must have intended the same for this case. *See Mehaffey*, 367 N.C. at 128, 749 S.E.2d at 257. We disagree, based on the wording of the Supreme Court's mandate, its affirmance of this Court's prior opinion, and the differences in the factual situations and findings made in *Mehaffey* as compared to this case.

A.     Standard of Review

We review *de novo* the Industrial Commission's conclusions of law.  *Lewis v. Sonoco Prods. Co.*, 137 N.C. App. 61, 68, 526 S.E.2d 671, 675 (2000).

B.     Analysis

Our Supreme Court's mandate is somewhat cryptic, so we must review the mandate carefully, along with the exact procedural posture of this case and the ruling in *Mehaffey*, to understand what it was directing the Commission to do.  Essentially the Supreme Court issued two directives in its mandate:

> 1.     For the reasons stated in [*Mehaffey v. Burger King*, 367 N.C. 120, 749 S.E.2d 252 (2013)], the decision of the Court of Appeals is affirmed as to the matter on appeal to this Court, and
>
> 2.     this case is remanded to that court for further remand to the Industrial Commission for further proceedings not inconsistent with *Mehaffey*.

*Chandler*, 367 N.C. 160-61, 749 S.E.2d 278.

i.     Our Supreme Court's Affirmance

First, the Supreme Court *affirmed* the prior Court of Appeals opinion, "as to *the matter on appeal* to [the Supreme] Court[.]"  *Id.*, 749 S.E.2d 278 (emphasis added). It affirmed the opinion "[f]or the reasons stated in *Mehaffey*[.]"  *Id.*, 749 S.E.2d 278. Since "the matter on appeal to" the Supreme Court was affirmed, we must determine what "matter" was "on appeal[.]"  *See id.*, 749 S.E.2d 278.  In *Chandler I*, both plaintiff and defendants appealed the Commission's opinion and award.  *Chandler I*, 217 N.C.

App. at 418, 720 S.E.2d at 747. The plaintiff's "sole issue" on appeal before the Court of Appeals was "whether the Commission erred as a matter of law in denying interest to plaintiff on the award of unpaid attendant care, accruing from the date of the initial hearing until paid by defendants." *Id.* at 423, 720 S.E.2d at 750. This Court agreed with plaintiff and ruled that the Commission did err by failing to award interest. *Id.* at 425, 720 S.E.2d at 751.

In *Chandler I,* defendants also appealed from the Commission's opinion and award and their appeal to this Court raised three issues. The first argument was "that the Commission erred in awarding plaintiff compensation for attendant care services" because "plaintiff was required to obtain written authority from the Commission to recoup fees associated with the rendition of attendant care services by Mr. Chandler" and that "they were not advised of plaintiff's attendant care needs[.]" *Id.,* 720 S.E.2d at 751. We rejected this argument in *Chandler I. Id.* at 427, 720 S.E.2d at 752. Defendant's second issue in *Chandler I* was the hourly rate of compensation which the Commission awarded for the attendant care services, and the third issue was the Commission's award of attorneys' fees to plaintiff. *Id.* at 427, 429, 720 S.E.2d at 752-53. We rejected both of these arguments as well, and thus affirmed the Commission's opinion and award except as to the issue raised in plaintiff's appeal, the award of interest, and we remanded to the Commission "for a determination as to the proper award of interest to plaintiff on the unpaid portion of

attendant care services pursuant to the terms of N.C. Gen. Stat. § 97-86.2." *Id.* at 430, 720 S.E.2d at 754.

The opinion of this Court in *Chandler I* was unanimous, so defendants petitioned the Supreme Court for discretionary review on issues of "interpretation and application of section 14 of the Workers' Compensation medical fee schedule as it relates to a claimant's entitlement to attendant care services[.]" (Original in all caps.) In their petition, defendants noted some confusion in this area of law based upon some "inconsistent decisions by the Supreme Court and Court of Appeals" on the issue of "whether a workers' compensation claimant must seek pre-approval of attendant care services before these services are compensable[.]" Defendants stated the issue to be briefed on discretionary review as follows: "Whether the Court of Appeals erred in affirming the Full Commission's award of retroactive attendant care benefits even though Plaintiff failed to seek prior approval for attendant care?" The Supreme Court granted discretionary review. *Chandler v. Atl. Scrap & Processing*, 366 N.C. 232, 731 S.E.2d 141 (2012).

Before the Supreme Court, the defendants presented the following arguments:

> I. THE COURT OF APPEALS ERRED IN AFFIRMING THE FULL COMMISSION'S AWARD OF RETROACTIVE ATTENDANT CARE BENEFITS EVEN THOUGH PLAINTIFF FAILED TO SEEK PRIOR APPROVAL FOR ATTENDANT CARE.
>
>> A. The Court of Appeals' Decision Ignores the Directive of N.C. Gen. Stat. § 97-25 Allowing

Defendants to Direct Medical Treatment.

B.     The Court of Appeals' Decision is Inconsistent with the Industrial Commission's Fee Schedule.

C.  The Court of Appeals' Decision is Inconsistent with This Court's Decision in [*Hatchett v. Hitchcock Corp.*, 240 N.C. 591, 83 S.E.2d 539 (1954)].

D.     The Court of Appeals Erred in Basing its Decision on N.C. Gen. Stat. § 97-90.

(Portion of original underlined and page numbers omitted.)

In the first clause of its mandate, the Supreme Court's ruling upon these arguments was as follows:  "For the reasons stated in [*Mehaffey v. Burger King*, 367 N.C. 120, 749 S.E.2d 252 (2013)], the decision of the Court of Appeals is affirmed as to the matter on appeal to this Court[.]"  *Chandler*, 367 N.C. 160-61, 749 S.E.2d 278. The "matter on appeal" was quite specifically the award of compensation for attendant care services provided by Mr. Chandler, and defendants had challenged the legal and factual basis for this award.  In *Mehaffey*, the Supreme Court addressed essentially the same arguments as to N.C. Gen. Stat. § 97-25, the fee schedule, and the interpretation of *Hatchett*, and rejected those arguments; for the same reasons, the Supreme Court affirmed the Court of Appeals' opinion in this case.  *Id.*, 749 S.E.2d 278; *Mehaffey*, 367 N.C. at 124-28, 749 S.E.2d at 255-57.  Thus we will now consider the second part of the mandate, which is the remand to this Court for "further remand

to the Industrial Commission for further proceedings not inconsistent with *Mehaffey*."

*Chandler*, 367 N.C. 160-61, 749 S.E.2d 278.

    ii.     Our Supreme Court's Remand

In *Mehaffey*, on 13 August 2007, the plaintiff suffered a compensable injury to

his left knee while working as a restaurant manager. *Mehaffey*, 367 N.C. at 121, 749

S.E.2d at 253. The Supreme Court summarized plaintiff's medical history as follows:

> As a result of his injury, plaintiff underwent a "left knee arthroscopy with a partial medial meniscectomy" at Transylvania Community Hospital. Plaintiff's condition failed to improve after surgery, and he ultimately developed "reflex sympathetic dystrophy" ("RSD"). Despite undergoing a number of additional procedures, plaintiff continued to suffer pain. Plaintiff eventually was diagnosed with depression related to the injury and resulting RSD, and his psychiatrist concluded that it was unlikely plaintiff's "mood would much improve until his pain is under better control."
>
> Likely due to pain, plaintiff increasingly attempted to limit his movements following his diagnosis of RSD. By 8 April 2008, plaintiff was using "an assistive device" to move or walk around. On 21 April 2008, John Stringfield, M.D., plaintiff's family physician, prescribed a mobility scooter for plaintiff, and medical records show that by 20 June 2008, plaintiff was using a walker. On 18 December 2008, plaintiff requested a prescription for a hospital bed from Eugene Mironer, M.D., a pain management specialist with Carolina Center for Advanced Management of Pain, to whom plaintiff had been referred as a result of his diagnosis with RSD. Dr. Mironer's office declined to recommend a hospital bed, instructing plaintiff to see his family physician instead. That same day plaintiff visited his family physician, Dr. Stringfield, who prescribed both a hospital bed and a motorized wheelchair.

*Id.*, 749 S.E.2d at 253 (brackets omitted). Beginning in March 2009, a nurse consultant and other individuals recommended that the plaintiff receive attendant care services. *Id.* at 122, 749 S.E.2d at 254. On 6 April 2009, the plaintiff requested a hearing to determine the defendants' liability for these attendant care services. *Mehaffey v. Burger King*, 217 N.C. App. 318, 320, 718 S.E.2d 720, 722 (2011), *rev'd in part*, 367 N.C. 120, 749 S.E.2d 252 (2013). The Commission compensated the plaintiff's wife for attendant care services that she provided beginning 15 November 2007, the date of the plaintiff's RSD diagnosis. *Id.* at 320-21, 718 S.E.2d at 722. In other words, the Commission decided to award compensation for attendant care services that began more than one year before attendant care services were recommended by a medical professional or the plaintiff made a request for such compensation. *Id.*, 718 S.E.2d at 722.

Our Supreme Court held that the Commission had authority to award retroactive compensation for the plaintiff's wife's attendant care services. *Mehaffey*, 367 N.C. at 127, 749 S.E.2d at 256-57. But the Court did not affirm the Commission's opinion and award; rather, it remanded the case for additional findings of fact and conclusions of law as to the issue of the reasonableness of the plaintiff's delay in requesting compensation for attendant care services:

> Nonetheless, we are unable to affirm the Commission's award of compensation for Mrs. Mehaffey's past attendant care services. As plaintiff concedes, to receive compensation for medical services, an injured

> worker is required to obtain approval from the Commission
> within a reasonable time after he selects a medical
> provider. *Schofield v. Tea Co.*, 299 N.C. 582, 593, 264
> S.E.2d 56, 63 (1980). If plaintiff did not seek approval
> within a reasonable time, he is not entitled to
> reimbursement. Here, defendants have challenged the
> reasonableness of the timing of plaintiff's request, and the
> opinion and award filed by the Full Commission does not
> contain the required findings and conclusions on this issue.
> Accordingly, we remand to the Court of Appeals for further
> remand to the Commission to make the necessary findings
> of fact and conclusions of law on this issue.

*Id.* at 128, 749 S.E.2d at 257. The Court based its decision to remand on *Schofield*.

*Id.*, 749 S.E.2d at 257.

In *Schofield*, the plaintiff suffered from a medical emergency late in the

evening when he was away from home, and he sought the services of a physician who

had not been selected by the defendant. *Schofield*, 299 N.C. at 588-89, 264 S.E.2d at

61. Even after the emergency was over, this physician continued to treat the

defendant for seventeen months, but "neither he nor plaintiff made any attempt to

notify defendant or the Commission." *Id.* at 592, 264 S.E.2d at 63. Our Supreme

Court held that the plaintiff did not need prior approval from the Commission to

procure his own doctor. *Id.*, 264 S.E.2d at 63. The Court relied on N.C. Gen. Stat. §

97-25 (1979), which included the proviso: "Provided, however, if he so desires, an

injured employee may select a physician of his own choosing to attend, prescribe and

assume the care and charge of his case, subject to the approval of the Industrial

Commission." *Id.* at 591-92, 264 S.E.2d at 62-63 (quoting N.C. Gen. Stat. § 97-25

(1979)). But the Court rejected the plaintiff's argument that he could indefinitely

delay giving notice to the defendant or the Commission:

> The Court of Appeals interpreted [N.C. Gen. Stat. § 97-25 (1979)] as imposing no time limits whatsoever on the giving of notice or seeking of approval by an employee who changes physicians. Such a reading of the statute suggests that an employee may wait an indefinite period of time before obtaining authorization and approval from the Industrial Commission. However, it is inconceivable to us that the legislature intended to authorize an employee in this situation to give notice at his whim. Moreover, construing the statute as plaintiff urges would work a burden and an injustice on all parties involved. In fairness to everyone concerned, including the injured employee and his doctor, *an employer who is subject to liability for medical costs ought to be apprised of the fact, as soon as is practicable, that the employee is undergoing treatment and that he has procured a doctor of his own choosing to administer the treatment.*
>
> We therefore construe the statute to require an employee to obtain approval of the Commission within a reasonable time after he has selected a physician of his own choosing to assume treatment. In this case, plaintiff procured the services of Dr. Klenner during an emergency. Upon termination of the emergency, plaintiff should have given prompt notice that he was electing to have Dr. Klenner assume further treatment. Furthermore, as we construe the statute, plaintiff was required to obtain approval of the Commission within a reasonable time. We so hold.

*Id.* at 592-93, 264 S.E.2d at 63 (emphasis added). In other words, the Court held that

a plaintiff must obtain the Commission's approval "within a reasonable time" after

he has selected a new physician without the employer's knowledge, and the Court

based its holding on the policy view that an employer should be seasonably notified

when an injured employee selects a new physician since it is responsible for the employee's medical expenses. *Id.*, 264 S.E.2d at 63. The Court remanded the case to the Commission to make findings of fact as to the reasonableness of the plaintiff's delay in seeking approval from the Commission. *Id.* at 594, 264 S.E.2d at 64.

The factual situation as found by the Commission here is quite different from *Mehaffey* and *Schofield*. In those cases, the plaintiffs had selected care providers without the participation or knowledge of their employers or workers' compensation carriers. *Id.* at 592, 264 S.E.2d at 63; *Mehaffey*, 217 N.C. App. at 319-20, 718 S.E.2d at 722. Neither of them suffered from any cognitive impairment requiring the appointment of a guardian or a guardian *ad litem*. *Mehaffey*, 367 N.C. at 121, 749 S.E.2d at 253; *Schofield*, 299 N.C. at 588-89, 264 S.E.2d at 61. Additionally, in *Mehaffey*, two doctors indicated that the plaintiff would "derive greater benefit if he attempted to move under his own strength, which would force him to rehabilitate his injury." *Mehaffey*, 367 N.C. at 122, 749 S.E.2d at 253-54. But in this case, defendants directed and provided all of the medical care for plaintiff, and the physicians selected by defendants made the determination that plaintiff needed full-time attendant care. Defendants were aware of this determination essentially as soon as it was made, since Nurse Wilson, Liberty Mutual's designated medical case manager, was fully and promptly advised of plaintiff's deteriorating situation and consequent need for constant attendant care services. She was also aware that plaintiff's husband was,

of necessity, providing the attendant care services. In addition, neither a guardian of plaintiff's person nor a guardian *ad litem* had been appointed until after plaintiff requested compensation for Mr. Chandler's attendant care services. Moreover, there was never any difference of opinion among the medical providers about plaintiff's severe cognitive impairment and consequent need for attendant care services.

In its 25 February 2010 opinion and award, the Commission made the following findings of fact, which address the issue of the reasonableness of plaintiff's delay in requesting compensation for attendant care services and which defendants do not challenge on appeal:

> 12. On December 23, 2003 Dr. Templon also recommended plaintiff see a neurologist. *Defendants arranged for plaintiff to see neurologist Carlo P. Yuson in Winston-Salem, NC.*
>
> 13. On January 14, 2004, plaintiff saw Dr. Yuson, complaining primarily of frequent headaches and memory problems since the fall. Dr. Yuson diagnosed, and the Full Commission so finds, that plaintiff suffers from post-concussive syndrome from the fall, along with depression secondary to her fall.
>
> 14. Plaintiff saw Dr. Yuson in March, April and May 2004. Plaintiff continued to have the following symptoms due to her closed head injury from the fall: severe headaches, memory problems, dizziness, crying spells, insomnia, cognitive problems, and depression. *On April 6, 2004, Dr. Yuson recommended that plaintiff be re-evaluated concerning her cognitive functioning and memory problems.*
>
> 15. *On May 3, 2004 carrier Liberty Mutual assigned its nurse Bonnie Wilson to provide medical case management*

*services in plaintiff's claim. Nurse Wilson arranged for plaintiff to be reevaluated by Dr. Naylor on June 28, 2004.*

16. On June 28, 2004 Dr. Naylor re-evaluated plaintiff's cognitive functioning and memory. Plaintiff was tearful and clinging to her husband. Testing revealed, and the Full Commission finds, as follows: (i) plaintiff's intellectual functioning had fallen from the borderline to the impaired range; (ii) plaintiff's memory function revealed a sharp decline into the impaired range in all areas—verbal, nonverbal, structured, and unstructured; (iii) plaintiff had a significant compromise in her conversational speech, that is, plaintiff only spoke when spoken to, her responses were short and often fragmented and confused, and she had difficulty responding to questions. All of the above conditions are due to plaintiff's closed head injury from her fall. Plaintiff's additional symptoms were as follows and are also due to her closed head injury from her fall: 1) inability to answer questions; 2) fearful and reliant on her husband; 3) hears people in the home without any basis; 4) is afraid to go anywhere alone, even in her own home; 5) is easily upset; 6) has significant confusion as her speech makes no sense; 7) has poor concentration and memory; 8) her moods change quickly; 9) is incapable of performing even simple tasks of daily living, e.g., puts a fitted sheet on top of a flat sheet when trying to make a bed; 10) is unable to cook anything; 11) takes naps during the day due to frequent insomnia at night; 12) has decreased appetite and poor energy; 13) cries easily; and 14) feels worthless. All the foregoing test results and plaintiff's symptoms indicate that as of June 28, 2004, plaintiff suffered from severe and global cognitive deficits in higher cortical functioning.

17. Based on the totality of the evidence of record, the Full Commission finds that plaintiff's above listed conditions and symptoms and her severe and global cognitive deficits in higher cortical functioning are all a result of her closed head injury or traumatic brain injury due to her August 11, 2003 work-related fall.

18. *On July 20, 2004, Dr. Naylor gave her written evaluation report concerning plaintiff's severe cognitive and memory impairments to carrier's nurse Bonnie Wilson and also discussed the report and its conclusions with her. Dr. Naylor informed Ms. Wilson that plaintiff's cognitive and mental condition had greatly deteriorated since prior testing in early December 2003, and that plaintiff was no longer capable of caring for herself and needed constant supervision which out of necessity was being provided by her husband.*

19. *By at least July 20, 2004, the carrier was well aware that plaintiff required constant attendant care services, and that plaintiff's husband was providing constant attendant care services to plaintiff without any compensation for his services.*

20. Beginning on at least June 28, 2004, and continuing, plaintiff has been incapable of being alone and has been unable to perform most activities of daily living without assistance from her husband. She has required constant supervision and attendant care services, that is, on a 24 hours a day, 7 days a week basis, including at night, due to her severe cognitive impairments, insomnia, paranoia, and fear of being alone, all due to her traumatic brain injury from her fall.

21. Dr. Yuson has continued to treat plaintiff for her severe headache condition, as well as her insomnia, emotional state, and depression resulting from her accident, with various medications which have provided some relief.

22. By on or about August 23, 2004 plaintiff reached maximum medical improvement in relation to her traumatic brain injury resulting from her fall.

23. On September 21, 2004 defendants completed I.C. Form 60 "Employer's Admission of Employee's Right to Compensation Pursuant to N.C. Gen. Stat. § 97-18(b)" admitting plaintiff's right to compensation for her August

11, 2003 injury by accident.

24. On October 27, 2004, plaintiff saw Dr. Yuson, with Ms. Wilson in attendance. By this date, Dr. Yuson notified Ms. Wilson that, in his opinion, plaintiff would never get any better mentally than she was as of August 23, 2004. At this meeting Dr. Yuson discussed Dr. Naylor's July 20, 2004 report with Ms. Wilson, including that plaintiff required constant attendant care services due to her cognitive and emotional impairments resulting from her fall.

25. On October 27, 2004, the carrier was well aware that plaintiff required constant attendant care services as provided by her husband due to her traumatic brain injury resulting from her August 11, 2003 fall. *Defendants elected not to secure attendant [care] services or pay plaintiff's husband for the attendant care services he provided plaintiff.*

26. On November 4, 2004, Ms. Wilson wrote Dr. Yuson, explaining that carrier's claim representative had requested that Dr. Yuson provide his written opinion concerning [plaintiff's] permanent work restrictions. *Since at least May 2004, one of Ms. Wilson's primary functions was to assist plaintiff in receiving the medical treatment recommended by Dr. Yuson.*

27. On December 1, 2004, Dr. Yuson responded to Nurse Wilson's November 4, 2004 correspondence with the following:

> "This in reply to your inquiry regarding [plaintiff's] disability rating.
>
> The biggest problem that [plaintiff] still is experiencing is related to the cognitive and emotional impairment which is adequately documented in her previous neuropsychological evaluations. Based on

these, she has persisting moderate to severe emotional impairment even under minimal stress as well as an impairment of complex integrated higher cortical functioning necessitating constant supervision and direction on a daily basis. In light of above difficulties, the AMA disability rating list[s] a disability rating of 80% permanent disability.

I hope that this . . . information is helpful in her further evaluation."

28. By early December 2004, Dr. Yuson again notified defendant Liberty Mutual that plaintiff required constant supervision due to her cognitive and emotional impairments resulting from her brain injury due to her fall.

29. *In the period since at least July 20, 2004, Liberty Mutual made no effort whatsoever to provide plaintiff with the attendant care services she required due to her brain injury.*

. . . .

34. On August 27, 2008, plaintiff filed a motion seeking an order compelling defendants to pay plaintiff's husband, Lester Chandler, for providing attendant care services to plaintiff for the period beginning July 20, 2004, forward. This request was amended in the Pre-trial Agreement to be for the period beginning June 28, 2004, the date Dr. Naylor reevaluated plaintiff's cognitive and memory functioning. Plaintiff also sought an award of permanent total disability benefits.

35. Plaintiff's husband Lester Chandler has provided the required constant attendant care services to plaintiff for the period beginning at least on June 28, 2004, and continuously thereafter without any compensation for his services.

> . . . .

> 43. On December 10, 2008 the Clerk of Court for Stokes County, N.C. determined that plaintiff was incompetent and appointed Lester Chandler to be her guardian.

(Emphasis added.)

In April 2004, defendants' selected physician, Dr. Yuson, recommended that another physician reevaluate plaintiff's cognitive functioning and memory problems. Nurse Wilson, whom Liberty Mutual selected to provide medical case managements services and assist plaintiff in receiving any medical treatment recommended by Dr. Yuson, arranged for Dr. Naylor to conduct this reevaluation on 28 June 2004. Based on this 28 June 2004 reevaluation, Dr. Naylor determined that plaintiff required constant attendant care services, which out of necessity Mr. Chandler was providing. On 20 July 2004, Dr. Naylor discussed this conclusion with Nurse Wilson. The Commission thus found that less than a month after 28 June 2004, the beginning of the period for which plaintiff requests compensation for attendant care services, Liberty Mutual had actual notice that plaintiff required constant attendant cares services and that Mr. Chandler was providing those services without any compensation. Liberty Mutual neither elected to secure a different provider, nor did it compensate Mr. Chandler for these services. Neither a guardian of plaintiff's person nor a guardian *ad litem* had been appointed until after plaintiff requested compensation for Mr. Chandler's attendant care services. We also note that in

September 2004, defendants filed Form 60 admitting plaintiff's right to compensation for her August 2003 injury.

In addition, in defendants' first appeal, this Court arrived at this same conclusion that "defendants had notice of plaintiff's required attendant care services, which out of necessity, were being provided by Mr. Chandler" and affirmed the Commission's award of compensation to Mr. Chandler for attendant care services. *Chandler*, 217 N.C. App. at 427, 720 S.E.2d at 752. We further note that our Supreme Court affirmed *per curiam* the Court's decision. *Chandler*, 367 N.C. 160-61, 749 S.E.2d 278.

Defendants continue to argue, as they have twice before the Industrial Commission, previously before this Court in *Chandler I*, and before the Supreme Court, that plaintiff's delay in formally requesting attendant care services, until 27 August 2008, over four years after 28 June 2004, was unreasonable. They argue that in light of *Mehaffey*, the Commission needed to make a finding of fact as to whether this delay was reasonable. *See Mehaffey*, 367 N.C. at 128, 749 S.E.2d at 257. But the Supreme Court's mandate did not say this; it said "[f]or the reasons stated in [*Mehaffey v. Burger King*, 367 N.C. 120, 749 S.E.2d 252 (2013)], the decision of the Court of Appeals is affirmed as to the matter on appeal to this Court[.]" *Chandler*, 367 N.C. 160-61, 749 S.E.2d 278. This Court and the Supreme Court have already rejected defendants' argument. *Id.*, 749 S.E.2d 278; *Chandler I*, 217 N.C. App. at 427,

720 S.E.2d at 752. The Supreme Court remanded the case to the Commission *only* to enter an award of interest on the unpaid balance of the attendant care compensation and to determine the amount of attorneys' fees to be awarded to plaintiff for defending against defendants' first appeal, and on remand the Commission properly addressed both those issues.

The *Mehaffey* Court based its holding on *Schofield*, and the *Schofield* Court, in turn, based its holding on the policy view that an employer should be seasonably notified when an injured employee seeks new or different medical treatment since it is responsible for the employee's medical expenses. *Mehaffey*, 367 N.C. at 128, 749 S.E.2d at 257; *Schofield*, 299 N.C. at 592-93, 264 S.E.2d at 63. In *Schofield*, the plaintiff did not make any attempt to notify the defendant or the Commission of his selection of a new physician for a period of seventeen months. *Schofield*, 299 N.C. at 592, 264 S.E.2d at 63. Similarly, nothing in *Mehaffey* suggests that the defendants were aware of the plaintiff's need for attendant care services or that his wife had been providing those services until the plaintiff requested compensation more than one year after the beginning of the period for which he requested compensation. *See Mehaffey*, 367 N.C. at 121-23, 749 S.E.2d at 253-54; *Mehaffey*, 217 N.C. App. at 320, 718 S.E.2d at 722. Additionally, medical professionals did not begin recommending that the plaintiff receive attendant care services until more than one year after the beginning of the plaintiff's requested period, and two doctors indicated that the

plaintiff would "derive greater benefit if he attempted to move under his own strength, which would force him to rehabilitate his injury." *Mehaffey*, 367 N.C. at 122-23, 749 S.E.2d at 253-54. Because the Commission had not already made findings on this issue, the Supreme Court remanded for additional findings of fact as to the delay in requesting compensation for attendant care services. *Id.* at 128, 749 S.E.2d at 257.

In contrast, here, both Dr. Yuson and Dr. Naylor were selected either by defendants or by Nurse Wilson, Liberty Mutual's selected medical case manager. Nurse Wilson arranged for the 28 June 2004 evaluation in which the severity of plaintiff's brain injury and plaintiff's consequent need for constant attendant care services became abundantly evident. The physicians' opinions on plaintiff's condition and need for constant attendant care services were unanimous. And it is not surprising that plaintiff herself might fail to promptly request attendant care services, since her mental functioning was at the level of a four-year-old child and neither a guardian of plaintiff's person nor a guardian *ad litem* were appointed until December 2008, four months after plaintiff requested compensation. The Commission found that Liberty Mutual had actual notice less than one month after the 28 June 2004 evaluation, which is the beginning of the period for which plaintiff requests compensation. Despite plaintiff's severe cognitive disability and need for constant attendant care, Liberty Mutual made no efforts to secure a different

provider, nor did it compensate Mr. Chandler for these services. The policy concern expressed in *Schofield* is entirely absent here, because within a matter of weeks, defendants had actual notice of Mr. Chandler's attendant care services and chose not to seek alternative treatment.

Defendants essentially request that we impose a "magic words" requirement, such that to award compensation to Mr. Chandler, the Commission must state the following in its opinion and award: "Plaintiff's delay in requesting compensation was reasonable because defendants had prompt actual notice of Mr. Chandler's attendant care services from both her treating physician and another physician, that they were further aware that plaintiff's mental functioning was at the level of a four-year-old child, and they chose not to offer alternative attendant care services." We do not believe that the Supreme Court's ruling in *Mehaffey* imposes any such requirement. The Commission's extensive findings of fact, quoted above, demonstrate that the Commission has already carefully analyzed this issue and concluded in favor of plaintiff. Accordingly, we hold that the Commission's decision on remand not to make additional findings of fact on this issue was entirely consistent with *Mehaffey*. *See Chandler*, 367 N.C. 160-61, 749 S.E.2d 278. This holding is based narrowly on the facts of this case and is in accord with the holding in *Mehaffey* that "an injured worker is required to obtain approval from the Commission within a reasonable time after he selects a medical provider." *Mehaffey*, 367 N.C. at 128, 749 S.E.2d at 257 (citing

*Schofield*, 299 N.C. at 593, 264 S.E.2d at 63). "If plaintiff did not seek approval within a reasonable time, he is not entitled to reimbursement." *Id.*, 749 S.E.2d at 257. We therefore hold that the Commission properly followed our Supreme Court's mandate.

### III.    Motion for Attorneys' Fees

Under N.C. Gen. Stat. § 97-88, plaintiff moves that we order defendants to pay her attorneys' fees incurred in defending against this appeal. N.C. Gen. Stat. § 97-88 provides:

> If the Industrial Commission at a hearing on review or any court before which any proceedings are brought on appeal under this Article, shall find that such hearing or proceedings were brought by the insurer and the Commission or court by its decision orders the insurer to make, or to continue payments of benefits, including compensation for medical expenses, to the injured employee, the Commission or court may further order that the cost to the injured employee of such hearing or proceedings including therein reasonable attorney's fee to be determined by the Commission shall be paid by the insurer as a part of the bill of costs.

N.C. Gen. Stat. § 97-88 (2013). In *Cox v. City of Winston-Salem*, this Court interpreted this statute:

> The Commission or a reviewing court may award an injured employee attorney's fees under section 97-88, if (1) the insurer has appealed a decision to the [F]ull Commission or to any court, and (2) on appeal, the Commission or court has ordered the insurer to make, or continue making, payments of benefits to the employee. Section 97-88 permits the Full Commission or an appellate court to award fees and costs based on an insurer's unsuccessful appeal. Section 97-88 does not require that

> the appeal be brought without reasonable ground for plaintiff to be entitled to attorney's fees.

*Cox*, 157 N.C. App. 228, 237, 578 S.E.2d 669, 676 (2003) (citations, quotation marks, brackets, and ellipsis omitted). In determining whether to award attorneys' fees under this statute, we must exercise our discretion. *See Brown v. Public Works Comm.*, 122 N.C. App. 473, 477, 470 S.E.2d 352, 354 (1996).

Because defendants have unsuccessfully appealed and we affirm the Commission's decision to award compensation to Mr. Chandler, the statutory requirements of N.C. Gen. Stat. § 97-88 have been satisfied. *See* N.C. Gen. Stat. § 97-88; *Cox*, 157 N.C. App. at 237, 578 S.E.2d at 676. We note that on defendants' first appeal, this Court awarded plaintiff attorneys' fees incurred in defending against that appeal under N.C. Gen. Stat. § 97-88. *See Chandler*, 217 N.C. App. at 418, 720 S.E.2d at 747. The Supreme Court affirmed *per curiam* that opinion. *See Chandler*, 367 N.C. 160-61, 749 S.E.2d 278. In our discretion, we again grant plaintiff's motion for attorneys' fees and remand the case to the Commission to determine a reasonable amount for appellate attorneys' fees. *See Brown*, 122 N.C. App. at 477, 470 S.E.2d at 354.

## IV.    Conclusion

For the foregoing reasons, we affirm the Commission's opinion and award. We also grant plaintiff's motion for attorneys' fees and remand the case to the Commission to determine a reasonable amount for appellate attorneys' fees.

AFFIRMED AND REMANDED.

Chief Judge MCGEE and Judge TYSON concur.